Filed 5/1/15  P. v. Housh CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARLOS CIPRANO HOUSH,<br><br>    Defendant and Appellant. | A138873<br><br>(Marin County<br>Super. Ct. No. SC176430A) |

Defendant Carlos Ciprano Housh was charged with the following offenses against his girlfriend from June 27 to June 29, 2011:  (Count 1) rape (Pen. Code, § 261, subd. (a)(2))[1]; (Count 2) sodomy by force (§ 286, subd. (c)(2)); (Count 3) corporal injury of a cohabitant on June 27 (§ 273.5, subd. (a)); (Count 4) corporal injury of a cohabitant on June 28 (§ 273.5, subd. (a)); (Count 5) assault with a deadly weapon (§ 245, subd. (a)(1)) using a "rock sculpture"; (Count 6) assault with a deadly weapon (§ 245, subd. (a)(1)) using scissors; (Count 7) criminal threats (§ 422); (Count 8) dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)); and (Count 9) false imprisonment by violence (§ 236).  The jury deadlocked on rape, sodomy by force, and the assault using scissors, and those charges were dismissed.  He was convicted of the remaining charges except for the assault with the rock sculpture for which he was convicted of misdemeanor assault as a lesser included offense.

---

[1] Unless otherwise indicated, further statutory references are to the Penal Code.

The court found that Housh had prior serious felony and strike convictions for attempted robbery in California in 1981, and for assault in Montana in 1996. Housh moved to strike the priors (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497). The court granted the motion as to the California conviction, denied the motion as to the Montana conviction, and sentenced him to 22 years and 8 months in prison.

Housh challenges his conviction and sentence on multiple grounds. He argues the prosecutor removed a prospective juror on the basis of race, the court erroneously admitted and excluded evidence, and the court erred in denying his motions for a mistrial after evidence barred by in limine rulings was introduced. He contends that the court had insufficient evidence from which to find that the Montana prior qualified as a serious and violent felony, and that the decision on this issue should have been made by a jury. He argues that some of his consecutive sentences violated section 654, and that a concurrent sentence for false imprisonment should have been stayed under that statute. Finally, he argues that the court abused its discretion when it denied his new trial motion based on newly-discovered evidence.

We agree that the concurrent sentence should have been stayed, and modify the judgment accordingly. Housh's other contentions lack merit, and we affirm the judgment as modified.

## I. FACTS

A. The Victim's Testimony

The victim testified that Housh continually assaulted her in her home on June 27, 28, and 29, 2011.

She said that she and Housh had a romantic relationship beginning in July 2009, after she was separated from her husband for a year. The victim worked as a geologist, but suffered from chronic pain after injuring her back. She was not working and had been mostly on bed rest for years when she met Housh at a grocery store. She received financial assistance from her husband and father. Housh moved into her San Rafael home in December 2009, and she supported him financially.

2

The victim said Housh first physically assaulted her at the end of December 2009, after she tried to break up with him. He shoved her into the walls of buildings and threw her to the ground on an outing to San Francisco. They had consensual sex through the spring of 2010, but he forced her to have sex on a trip to Montana in May of that year. After that, he raped her twice a week for about a year. The victim suffered her first "really big beating" from Housh on October 26, 2010, when he pinned her on the bed, slapped her on the sides of her head, and suffocated her with a pillow for half a minute.

Prosecution investigator John George said that, when he interviewed the victim, she did not mention the December 2009 incident, or that she was raped in Montana in May 2010.

The victim reported the October 2010 incident to San Rafael Police Officer Castaneda on November 2. She went to the police at her mother's insistence, and told the officer that she did not want to take the case to court because she feared public speaking. Castaneda testified that the victim reported being punched in the head. When he asked her for a detailed statement, she said she did not want to get Housh in trouble, and that her mother had forced her to make the report.

After the October 2010 incident, Housh's physical abuse became more frequent and violent. He would hit, slap, and kick her, and then force her to have sex. Housh got his own apartment in February 2011, but never entirely moved out of the victim's home, and they went back and forth between the residences. She was twice "able to get him out of the house," but he would "call and call and show up and eventually sweet-talk me into taking him back." She tried to break up with him at least half a dozen times, but stayed with him because she was very lonely and isolated, and he was "almost my only human contact" at that time.

The victim said that on June 27, 2011, they argued, she told him she was breaking up with him, and told him to leave her house. He hit her in the head and punched her in the arm. She tried to call 911, but the batteries had been removed from her land-lines, and she could not find her cell phone. Housh assaulted her for hours, slapping her repeatedly, hitting her in the head, and kicking her in the shins. He karate-chopped her in

3

the neck four or five times, hit her in the forehead with a stainless steel coffee cup, and twisted and punched her arm. She screamed for help, and ran for the door many times, but he grabbed her and pulled her back by the hair. Around 11:00 p.m. or midnight, he dragged her to the bedroom, threw her face down on the bed, held her there, and forced his penis into her anus for five or ten minutes. She broke free, slid off the bed, and hit her head on the floor. He picked her up, threw her face up on the bed, held her down, and forced his penis into her vagina for about five minutes. He then dragged her to the bathroom, pushed her into the shower, ordered her to "[w]ash down there," and watched while she washed her vaginal and anal areas. She went to bed, he turned on the TV and his computer, and she fell asleep.

The victim said that Housh continued hitting her off and on throughout the next day. She had a rock sculpture in the shape of an apple that weighed several pounds, and he repeatedly dropped it onto her kneecaps from a height of about three feet. He then moved to the other side of the living room, threw the sculpture at her, and hit her with it in the left thigh. While she was lying in bed that night, he took a pair of embroidery scissors, held them up to her left eye for ten minutes, and said, "I'm going to cut your eye out so no other man will be interested in you." When she later curled up into a fetal position on the bed, he punched her in her buttocks. He was sitting at the end of the bed when she went to sleep that night, and was there when she woke up the next morning.

Housh continued hitting her that next day, June 29. He hit her in the head and face, and kicked her legs. When she was lying on the living room sofa, he grabbed her right foot and jabbed a letter opener into the ends of her toes under her toenails. He used only moderate force, and while it hurt her, the letter opener did not cause any bleeding. She tried to leave the house on each of the three days, but he prevented her by grabbing her hair. At one point she got part way out the front door and screamed for help, but none came. Housh told her that if she left he would find and kill her.

On June 29, the victim and Housh went to the drive-through at a Kentucky Fried Chicken, and continued going to stores and restaurants in the days that followed. When she was asked why she did not try to escape during any of these excursions she answered,

4

"You know, I had just been through a horrible beating and rape, and all my courage was gone. I didn't think I would be able to call the police without him overhearing and stopping me, and I didn't think I would be able to run without him stopping me."

The victim and Housh went to the home of Housh's sister, Rosita Swearingen, in Antioch on July 4, where Swearingen had finished building a swimming pool. Swearingen testified that she noticed a bruise on the victim's arm, and that the victim said she had bumped into something. On July 9, the victim and Housh went to a park in Pittsburg for a barbeque with his family attended by about 80 people. Housh's sister Carmen Jacobs testified that she had a friendly conversation with the victim at the party. Housh's cousin Joaquin Cunhs testified that he spoke with her and Housh at the party and invited them to visit his home in Texas. The victim said "that would be nice," and seemed to be having a good time at the party. Swearingen and Jacobs said they saw the victim every day or two from June 27 to July 9. Swearingen never saw her upset or distressed, and Jacobs saw no hint of discord between her and Housh.

Melinda Shrock testified for the prosecution as an expert on intimate partner battering. She explained the reasons why victims of domestic violence delay reporting their abuse. She described strategies used by abusers to control their victims, and the cycle of violence involved in those relationships. She had spoken with over 5,000 domestic violence victims, and opined that false allegations of such abuse were uncommon.

Marcia Blackstock testified for the prosecution as an expert on rape trauma syndrome. She explained the reasons why victims of sexual assault often delay reporting their abuse.

On July 11, with the help of her mother, the victim had the police called to her home and Housh arrested.

B. The Victim's Psychiatric Condition and Treatment

Dr. Michael Moscowitz was the victim's treating psychiatrist, and had been treating her since 2002. He testified as an expert on chronic pain and bipolar disorder. He explained that a person with bipolar disorder is one who has suffered at least one

5

manic episode and one depressive episode. Characteristics of manic episodes include intensely disturbed interpersonal relationships, excessive pursuit of pleasurable activities, and paranoia. People having a depressive episode often become suicidal. "They don't have any motivation, they stay in bed, they cry a lot. They have very little emotional connection to anyone else."

Moscowitz testified that he initially diagnosed the victim with a depressive mood disorder associated with her medical condition, but changed the diagnosis in 2009 to bipolar disorder. In December 2008, Moscowitz observed that her mood was improving, but she "started accusing people of things and became more and more edgy. . . ." By March 2009, she was exhibiting manic symptoms, and by May 2009 Moscowitz concluded that she was manic. She stopped eating properly, and became uncharacteristically angry and sexually promiscuous. She "found herself waking up in places like the bedroom floor, not knowing how she got there." She said things that did not make any sense, such as "that she was writing stories about people dying violent deaths who were imposters. . . ." She did not want to take medication, "participated in very dangerous sexual liaisons," and "really had kind of gone off the deep end at that point."

The victim testified that she was over "a manic episode" when she met Housh in July 2009, but according to the testimony of Dr. Moscowitz, the episode was ongoing at that time. The victim contacted the police a number times during this manic period. San Rafael Police Officer Adams testified that the victim told him on May 30 that she feared her husband was tapping her phone and monitoring her calls. Adams said that she contacted him again on June 5, asking whether she should be concerned about terrorism because of files she had discovered on her computer. The victim testified that the files concerned Islam, and she was worried that her computer had been hacked. She went to the San Rafael Police Department on August 22 because text messages from Housh led her to believe, mistakenly, that he was trying to steal her identity.

Moscowitz thought the manic episode might have been caused by the victim's abruptly discontinued use of the numerous medications he had prescribed for her A urine

6

test in August 2009 showed none of the medications in her system. Her manic episode ended by September 2, 2009, after she resumed taking some of her medication. After some improvement, she became severely depressed in January 2010, "and then it would come and go after that." Moscowitz continued treating the victim, and testified that she had no further manic episodes. In June 2011, she was taking no medications that would have affected her memory or perceptions.

On cross-examination, Moscowitz confirmed that he prescribed the victim Abilify in the summer of 2009 to treat the "paranoia, delusions, grandiosity and hostility" she exhibited, and that she did not always follow his recommendations with that medication. He said that Abilify helps organize and clear the thoughts of someone who is depressed or manic, but that the victim was not on Abilify in June 2011. She reported physical, but not sexual, abuse by Housh before the June 2011 incidents. She also reported that her parents threatened to stop paying her mortgage unless she left Housh.

C. Other Evidence

Photos were taken of the victim's bruises when Housh was arrested on July 11. Moscowitz said that two of her prescribed medications could contribute to bruising, but had not done so in her case. Dr. Ryan O'Connor, an expert in emergency medicine and wound analysis, testified for the defense about the bruises that could be expected to result from injuries such as those described by the victim.

B. Kim Doe

Kim Doe testified that she met Housh in 1987 and married him in 1989. They had two unplanned children together. He began to physically abuse her two and one-half months into their relationship, and hit her almost daily thereafter. "Anything" could set him off. For example, he would hit her "[i]f he found dust on the furniture, dishes in the sink, anything dirty in the house, kids not bathed or dressed." She stayed with him because she was afraid of what he would do to her if she left, and she married him because they had children together and some of her relatives would not interact with him unless they were married. During their relationship, he forced her to have vaginal, anal, and oral sex. She left him several times, but came back because he said "things would be

7

different, but it never happened." She divorced him in 1992. In February 2011, she was convicted of a felony involving the sale of a controlled substance. In April 2011, she contracted an infection that affected her short-term memory.

Defense investigator Kristin Lewis testified that when she spoke with Kim in May 2012 and told her the victim was claiming that Housh sexually abused her, Kim "was very shocked and surprised and said that had never happened to her." Lewis said Kim also denied having been sexually abused by Housh when she spoke with her in July 2012. Kim testified she told Lewis that Housh had sexually assaulted her, and was not surprised by the charges against him "because of the type of person that [he] is." Prosecution investigator George testified that he had a phone conversation with Kim in November 2011, followed by more extensive interviews. In the phone call, Kim mentioned being physically but not sexually abused by Housh. But George said he asked her only a general question about their relationship, and did not specifically inquire about sexual abuse.

Rosemary H., Kim Doe's daughter and Housh's former stepdaughter, lived with Housh when she was ages three to six. Rosemary H. said that Housh slapped, punched, kicked, and threatened to kill Kim almost every day during that time. On October 16, 2011, she spoke with Housh. He told her that Kim was being subpoenaed to testify, and asked her to testify against Kim. He said "there would be money involved if I did," and that he would get it by suing the State of California if he was acquitted in this case. He did not tell her what her testimony should be.

## C. C.Doe

C.Doe testified that she met Housh at a party 13 years before the trial where she smoked a lot of marijuana and drank a beer. When she returned and drank her beer after going to the bathroom, it tasted funny. She felt funny, went to lie down in a bedroom, and fell asleep. When she woke up, Housh was on top of her, penetrating her vagina with his penis. She told him to get off of her, he did, and she left the party.

After the party, Housh twice came by the home where C.Doe was living with her boyfriend. The first time, her boyfriend's father was working at the house. He saw her

fearful reaction when Housh approached, asked Housh to leave, and he left. The second time, C.Doe was home alone. Housh entered the house, cornered her in a bedroom, and pulled his pants down, but got up from the bed without penetrating her. C.Doe "d[id]n't know if he heard a noise or something." She grabbed a gun by the side of the bed, told him to get out of her house, and he ran away.

C.Doe did not report the rape at the party until she found out she was pregnant. She knew that Housh was the father of the child because she had no other sex with an African-American. When she obtained and renewed a restraining order against Housh, she checked a box for "stalking," rather than "rape," as the reason for the order.

D. Housh's Alibi

Housh's sisters testified that he was helping to build the pool at Swearengin's home on the days of the charged crimes. Swearengin said that she bought the pool at Walmart with a debit card and cash. She could not find a receipt, and her bank could not find a debit card statement for the purchase. Jacobs was impeached with a 1998 conviction for felony welfare fraud. Housh did not testify.

## II. DISCUSSION

A. *Batson*/*Wheeler* Issue

Housh contends that the prosecutor improperly exercised a peremptory challenge against an African American prospective juror, G.W., on the basis of race. (*Batson v. Kentucky* (1986) 476 U.S. 79, 88 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*).)

(1) *Legal Principles*

"[U]se of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against 'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds'—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution" and "the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Avila* (2006) 38 Cal.4th 491, 541.)

9

"In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure." (*People v. Clark* (2011) 52 Cal.4th 856, 904. "First, the defendant must make out a prima facie case by 'showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citations.] " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.) A trial court's determination that no prima facie case has been established is reviewed de novo. (*People v. Bonilla* (2007) 41 Cal.4th 313, 342.)

"The existence or nonexistence of purposeful racial discrimination is a question of fact." (*People v. Lewis* (2008) 43 Cal.4th 415, 469, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919–920.) Denial of a *Wheeler/Batson* motion must accordingly be upheld "if the ruling is fairly supported by substantial evidence in the record, giving deference to the trial court which had the opportunity to observe . . . the juror." (*People v. Holt* (1997) 15 Cal.4th 619, 651.)

(2) *Record*

During voir dire, the court noted that Housh is African-American, that the victim is Caucasian, and that those facts were irrelevant to the case. Defense counsel made a reference to the book *To Kill a Mockingbird* in connection with past trouble "in the criminal justice system with handling black versus white crimes," and asked whether people continued to "carry their resentments about race into the jury box." G.W. was the only prospective African-American juror seated in the jury box for questioning.

G.W. recalled, in connection with *To Kill a Mockingbird*, hearing adults when she was growing up discussing whether an African-American man could get a fair trial, especially in the South. However, she said, "that's 50 years ago, and I think

10

there's been a lot of positive changes since then." She had "come to respect" the criminal justice system, citing her experiences watching *Law & Order*, and having friends who had brushes with the law. She said that she would have no racial bias in favor of Housh, adding that she thought she would have voted to convict O.J. Simpson if she had been a juror in his case. She had sat on two juries, one in a criminal case, and verdicts were reached in those cases.

G.W. grew up as an "Army brat," and was an Air Force veteran. She had retired the year before from the Department of Veteran Affairs Medical Center in San Francisco, where she worked primarily as an individual counselor and group therapist. She trained for that work in the Air Force, went to work for the VA, and completed her training by taking psychology classes at night and earning a college degree. Her work involved diagnosing mental health problems and determining the veracity of people she counseled.

The admissibility of the victim's bipolar disorder was being debated at the time of voir dire, and the court had not ruled on it. The prosecution exercised a peremptory challenge against another prospective juror, M.H., who was a retired psychiatric nurse, immediately before G.W. was seated in the jury box. In response to defense questioning, M.H. said she often had to judge patients' credibility, and acknowledged feeling sympathy for them. When the prosecutor asked M.H. whether she could put aside her specialized knowledge if called upon to evaluate a doctor's expert opinion in the case, she answered, "[T]hat's part of the whole thing that we do, is that you have to sift through the material and see what's there."

When G.W. was questioned by the court, she noted that M.H.'s "professional experiences are pretty much similar" to hers, and "wonder[ed] how I would answer some of those questions that [were] directed towards her." The prosecutor asked G.W., "Do you feel comfortable with . . . putting aside your expertise on any of the matters that we have discussed and listening to the expert, if there is one, testify based on what their expertise is?" G.W. answered, "Yes, I do."

11

The prosecutor did not initially excuse G.W. After she was questioned, both sides exercised peremptory challenges against other jurors, and the parties passed on further challenges. It appeared at that point that only alternate jurors remained to be selected, but then one of the jurors was excused for cause, and the court recessed for lunch. When court reconvened, the court noted that G.W. was absent, and voir dire resumed. When peremptory challenges resumed, the prosecutor excused G.W., and the defense made a *Batson/Wheeler* motion.

In support of the motion, defense counsel observed that G.W. was the only African-American juror questioned, and said that two of the other remaining jurors were White women "similar in age and background" to G.W. Counsel said those jurors displayed "reactions" and "reasoning" similar to G.W., and, like G.W., pledged that race would not be a factor in their deliberations.

The court observed that excusing G.W. was consistent with the prosecution's pattern of excusing jurors with mental health experience, including M.H. and two other prospective jurors. One had worked as a mental health counselor in the psychiatric unit of Marin General Hospital for the last 13 years. He had taken a lot of psychology courses, and his job was to "help counsel and stabilize people that come in under some mental health crisis, whether they are bipolar, schizophrenic." As with G.W. and M.H., the prosecutor asked the mental health counselor before excusing him whether he could put aside his professional knowledge and experience when he evaluated expert testimony in the case. The other excused juror with mental health experience worked as a life skills coach for people with mental disabilities. The court pointed out that G.W. had herself noted the similarity between her and M.H. The court found that the two female jurors identified by the defense were not "similarly situated" to G.W.

The court found no inference of a discriminatory purpose from the removal of G.W., and thus denied the *Batson/Wheeler* motion based on defense failure to make a prima facie case, but invited the prosecutor to state the reasons for her decision. The

prosecutor confirmed that her main reasons for excusing G.W. were her education and profession. The prosecutor explained, among other things: "Initially, when we were passing or challenging jurors, I did pass on [G.W.]. At that point, I had sort of a fight within myself whether or not I wanted to keep her, because she did appear, initially, to be a reasonable person; however, so did [M.H.]. And upon further reflection over the lunch hour, thinking about it a little bit more, remembering that she had a psychology bachelor's degree, the type of people that she worked with, the fact that she might have specialized knowledge in medications, those are all things that affected my determination as to whether or not to kick her after all."

(3) *Analysis*

We agree with the trial court's ruling on the *Batson/Wheeler* motion for a number of reasons.

First, and virtually conclusively, the prosecutor's initial decision to accept G.W. as a juror effectively negated any inference that she was acting on the basis of an improper group bias. If the prosecutor was bent on excluding African-American jurors, she would have challenged G.W. before the selection of jurors, other than alternates, appeared to be complete.

Second, the record supported the court's finding that jurors like G.W. with a background in psychology were consistently excused, regardless of race. The defense made no showing to the contrary. While the *Batson/Wheeler* inquiry did not reach beyond the first stage, the prosecutor's explanation for removing G.W. confirmed the court's identification of a race-neutral reason for the challenge. Housh argues that G.W. was not similarly situated to M.H., the juror with whom she was most closely compared, because M.H. said that one of her children was a court reporter who lived in Marin County. Housh speculates from this statement that M.H.'s child worked in the Marin courts, was familiar with counsel and possibly the trial judge in the case, and may have expressed opinions about them to M.H. Even if all of this conjecture were true, it would not change the fact that M.H. and G.W. had both worked in mental

13

health and could have been removed for that same reason. No two prospective jurors are exactly alike, and possible additional reasons for excluding M.H. did not raise an inference that G.W. was excused because of her race.

Third, while a prosecutor may excuse a prospective juror "even for arbitrary or idiosyncratic reasons" as long as they are nondiscriminatory (*People v. Lenix* (2008) 44 Cal.4th 602, 613), the reason given here—that prospective jurors' backgrounds in psychology could color their perceptions of testimony on that subject—was similar to those that have been recognized as valid grounds for peremptory challenges. (See, e.g., *People v. Landry* (1996) 49 Cal.App.4th 785, 790 [ " 'very bad experiences' " with jurors who had a background in psychiatry or psychology]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1124 [concern that juror "would place too much weight on the opinion testimony of psychologists"]; see also *People v. Streeter* (2012) 54 Cal.4th 205, 225, citing *People v. Clark* (2011) 52 Cal.4th 856, 907 ["peremptory challenge properly based on juror's experience in counseling or social services"].)

Finally, Housh made only a weak prima facie showing of unlawful group bias. He could point to only G.W. as an allegedly improper challenge. " '[E]ven the exclusion of a single prospective juror may be the product of an improper group bias. As a practical matter, however, the challenge to one or two jurors can rarely suggest a pattern of impermissible exclusion.' " (*People v. Bell* (2007) 40 Cal.4th 582, 598.) Moreover, Housh identified no similarities between G.W. and the two other jurors he alleged were comparable, and retained by the prosecution, other than age and gender, unexplained equivalent "background," "reactions," and "reasoning," and the fact that those jurors, like G.W., said that race would not enter into their decisions. Given the generality of these claims, deference to the trial court's opportunity to observe the other jurors is particularly appropriate. (*People v. Holt*, *supra*, 15 Cal.4th at p. 651.)

The *Batson/Wheeler* motion was correctly denied.

14

B.  <u>Exclusion of Dr. Moskowitz's December 2008 Psychiatric Report</u>

Although the court denied the prosecution's in limine motion to exclude any testimony about the victim's mental health, Housh argues that the court erred when it excluded evidence concerning Dr. Moskowitz's December 16, 2008 notes of her treatment.

(1) *Record*

The court ruled that the defense could present evidence of the victim's bipolar disorder to show that she was paranoid, delusional, or had problems perceiving or remembering events.  Housh subpoenaed Dr. Moscowitz's records of her treatment after 2006, and Moscowitz objected to the disclosure.  The court agreed to examine the records and determine which were discoverable.  During Moscowitz's trial testimony, the parties and the court discovered that the court had inadvertently failed to provide the parties with Moscowitz's December 16, 2008 notes, which read in relevant part as follows:

"[The victim] is grinding her teeth.  She is writing angry letters to a lot of people.  'It's around men and sex.'  The letters are . . . to . . . her father, her husband, her stepfather, 'men who have abused me in the past.'  She doesn't send the letters.  A theme is emerging.  She feels that her father and stepfather committed 'covert incest.'  Her father made her be like a 'little wife.'  He would unburden himself of his problems with her.  His (*sic*) father would tell her of his sexual frustrations.  Her mother and father were not together at that time.  She states that her stepfather makes inappropriate remarks about her sexually, causing her mother to make a suicide attempt on one occasion[].  She reveals a subsequent strange relationship with men.  Her stepfather remains sexually inappropriate.  A recent episode degenerated into physical violence."

Housh sought to question Moscowitz about these observations, arguing that they exhibited "fantastical thinking" by the victim "about men and about abuse."  Before trial Housh had asked the court to allow questioning about the victim's

15

allegedly false claim that, shortly before she began her relationship with Housh, her stepfather " 'made a pass' or 'put his hand up her skirt' or in some way attempted to touch her genitals." During discussions on in limine motions, defense counsel said the stepfather initially denied the allegation, but then said "[i]t happened" and he was "very ashamed" of it. The court excluded the allegation under Evidence Code section 352, saying, that "it may not be false. And we are not going to have a trial involving the truth of that allegation for the minimal relevance it may have here."

When the parties were arguing admissibility of the December 2008 report, it emerged that the stepfather admitted trying to kiss her but denied putting his hand up her skirt, and that the defense had decided not to present evidence of his conduct. After discussion of the December 2008 report, the court said it would allow the defense to question the victim about her stepfather's alleged physical violence, but excluded the report unless it could be used to impeach her testimony on the subject.

The court thus prohibited Housh from eliciting testimony about statements in the December 2008 report involving the victim's husband and father. The court acknowledged that prior false allegations of sexual activity might be admissible, but observed that "this is really vague stuff in here about letters she's writing, sending to nobody." The court noted that the report did not specify any abuse by the victim's husband, and mentioned nothing more than inappropriate remarks by her father. The court told the defense: "[I]f you had evidence that she was delusional and thinking other people have abused her, that might be fair and relevant, but this single paragraph in the medical report doesn't leave us with that conclusion. It only leaves us with speculation. . . . I think under Evidence Code section 352, I have let you go into quite a bit about her bipolar disorder and other delusional thoughts that she might have had in the past. I don't think that this paragraph opens the door to anything else at this point in time. [¶] So I will preclude you from asking Dr. Moskowitz about her letters or her statements there. I think the prejudice to the People outweighs any probative value."

16

Housh moved the next day for reconsideration of this evidentiary ruling, supported by reports of defense investigator Lewis. Lewis stated that she spoke with the victim's father, and that he denied sexually, physically, or emotionally abusing her. Lewis said she spoke with her husband, who also denied any such abuse. The husband said the father abused the victim "emotionally," but never sexually or physically. The court reaffirmed its prior ruling, stating, "I don't see anything in here that gives rise to even a hint that there is a potential conclusion that [she] made false allegations. What we have here is a medical report in which she tells the doctor that she wrote letters to nobody, for nobody that were delivered to nobody. They seem to be some sort of letters that she wrote to vent. . . . [¶] . . . [¶] I maintain that under Evidence Code section 352 . . . there's no probative value, and the unfairness in terms of the speculation that would be invited against the alleged victim here is undue prejudice and supports my ruling of yesterday."

The defense did not call the victim as a witness to question her about her stepfather's alleged physical violence.

(2) *Analysis*

A court has " 'broad discretion' under Evidence Code section 352 'to exclude even relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, or confusing the issues, or of misleading the jury." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 60.) "An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion. [Citation.] We will not reverse a court's ruling on such matters unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' [Citation.]" (*Id.* at p. 74; see also *People v. Vargas* (2001) 91 Cal.App.4th 506, 545, 543 [trial courts "have wide discretion in determining the relevancy of evidence"; no abuse of discretion under Evid. Code, § 352 unless court " ' "exceeds the bounds of reason, all of the circumstances considered" ' "].)

There was no abuse of discretion here, and no violation of Housh's constitutional rights (see, e.g., *People v. Abilez* (2007) 41 Cal.4th 472, 503 [discretionary evidentiary ruling did not violate right to present a defense]; *People v. Gurule* (2002) 28 Cal.4th 557, 620 [ordinary rules of evidence generally do not infringe on the right to present a defense; rejecting argument that restricted cross-examination violated rights to confrontation, due process, and a fair trial]; *People v. Cunningham* (2001) 25 Cal.4th 926, 999 [exclusion of defense evidence on a subsidiary point is not a deprivation of due process]).

The court could reasonably conclude that the December 2008 report had negligible probative value. The report named three alleged abusers: the victim's stepfather, father, and husband. The defense declined to explore allegations involving the stepfather and, as the court pointed out, the report referred only to inappropriate remarks by the father, and did not identify any of the abuse that may have been inflicted by the husband. The victim did not send any of the letters describing this alleged abuse. The court could reasonably conclude that the December 2008 report, without more, would only invite speculation by the jury about the abuse involved and whether it occurred. As the court told the defense: "I am not curtailing your investigation. You can certainly try to find out if she has made any false allegations against her husband or her father, or other allegations against the stepfather. But I don't think that this statement [the December 2008 report], in and of itself, evidences delusional beliefs that something like that happened."

Nor was Housh prejudiced, under any standard, by exclusion of the report. Even if its admission led to evidence most favorable to the defense—that the victim had made prior false allegations of sexual abuse—such evidence would not have changed the outcome because the jury did not convict Housh of the sex offenses charged in the case. The jury learned from Dr. Moskowitz and the testimony about the victim's reports to police during her 2009 manic episode that she wrote things that made no sense, and was paranoid, delusional, and hypersexual, during that time. Before the parties received the December 2008 report, Moscowitz referred to it saying he had a note indicating that "she was starting to get revved up about then," becoming "edgy" and "accusing people of

18

things." Given all of the evidence about the victim's manic episode, evidence that she was making delusional allegations in December 2008 could not have significantly affected the jury's impression of her.

C. <u>The Victim's References to Housh's Custodial Status and Prior Imprisonment</u>

Housh argues that the court erred when it denied his motions for a mistrial after the victim testified about his custodial status at the time of trial and prior incarceration.

(1) *Record*

The court granted Housh's motions to exclude any reference to the fact that he was in custody, to bifurcate the trial of the prior conviction enhancements, and to require the prosecution to advise its witnesses of the court's rulings on his in limine motions.

On direct examination, the victim testified that Housh sent her a letter on April 28, 2012. When the prosecutor asked her how she knew the letter was from Housh, she answered: "It has his name as a return address with the address of the Marin County Jail." The defense objected, and the court told the jury to "[d]isregard the location where the defendant—where the Witness stated the mail came from on April 28th of this year." Defense counsel said, "I don't think that admonition is sufficient," and asked to be heard outside the presence of the jury. The court said it would take up the matter during the next break.

During the break, Housh moved for a mistrial based on violation of the in limine exclusion of evidence of his custodial status. The prosecutor apologized for what she said was a "complete accident," explaining that she expected the victim to authenticate the letter by saying that it had Housh's name on it, and she recognized his handwriting. The prosecutor said she had instructed the victim not to refer to Housh's prior convictions, but said, "I don't know if I specifically told her not to mention his custody status."

The court denied the motion for a mistrial, stating: "I don't think the prejudice to the defendant is substantial, and with an additional curative instruction I think that the prejudice can be eliminated and we can assure ourselves that the jury will not consider his custody status for purposes of deciding the issues in this case."

19

Before the victim's testimony resumed, the court gave the following admonition: "[L]et me remind the jury of the last admonition I gave. [¶] When we neared the end of Ms. Doe's direct examination, there was some testimony about her receiving a letter with a certain return address on it, and I struck that testimony; that is, that return address, and I have ordered and admonished you to not consider that testimony for any purpose. [¶] I will go a step further now and admonish you, also, not to speculate in any respect as to the defendant's whereabouts at the time of that April 28th letter, or, for that matter, any time before or after that date. Where he was on that date is completely irrelevant to the issues in this case and . . . your decision-making process. [¶] It has nothing to do with the charges or the elements, and you are to disregard it and not let it affect you in any way. Thank you."

During redirect examination, the prosecutor asked, "Did the defendant ever tell you why he would sodomize you instead of rape you?" The victim answered, "Yeah. He said, I am not going to put any more bruises on you because I don't want to go *back* to prison for a woman. And he said, I am going to sodomized (*sic*) you every time you fuck up." (Italics added.) The defense objected, a recess was called, and Housh moved again for a mistrial, based on the earlier testimony about his custodial status, and the further testimony about his prior imprisonment. The court denied the mistrial motion, finding that an instruction to the jury to disregard the question and answer that led to the prior prison reference would cure any significant prejudice to Housh. The judge asked the defense if it wanted him to go "a little bit further," and instead instruct the jury that the victim "misspoke" when she talked about Housh going "back" to prison, and have her restate her answer without including that word. Defense counsel asked for the latter remedy, out of concern that an appellate court "would say that I had an alternative instruction that I failed to use."

After the recess, the court told the jury:

" I have another one of my admonishments for you, and I want to reference the last question and answer that were posed of Ms. Doe.

20

"The last question that was posed of Ms. Doe, the answer included a mistake, an error on the witness' part, that might have left you with an impression that would be improper.

"The question was:  Did the defendant ever tell you why he would sodomize you instead of rape you.

"The answer:  Yeah, he said I am not going to put any more bruises on you because I don't want to go back to prison for a woman, and then she continued with another portion of the answer.

"The word 'back' was a mistake, and that is the mistake that might leave you with the impression, wrongfully so, that the defendant has ever been incarcerated before.  You are not to speculate about that.  You are not to conclude anything by her mistaken use of the word 'back.'

"I am going to give her a chance to answer that question again without that mistaken language in a moment so you can hear the answer that she meant to give.  It's important that you not speculate about the issue . . . that the use of that word might have drawn up in your minds.  Don't speculate about it and simply don't consider it for any purpose during the course of the trial or your deliberations."

The victim then testified that defendant said "he didn't want to put any bruises on me because he didn't want to go to prison for a woman."

(2)  *Analysis*

"A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged," and we apply "the deferential abuse of discretion standard to review a trial court ruling denying a mistrial."  (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)  " 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' "  (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

"A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice."  (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.)  However, the improper subject matter will rarely be " 'of such a character that its

21

effect . . . cannot be removed by the court's admonitions.' " (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.) Deciding "whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.) Reversal is required only if it is reasonably probable that the volunteered comment could have affected the outcome of the trial. (*Ibid.*)

The court here took pains to ensure that the jury would disregard the victim's passing references to Housh's custodial status and prior imprisonment. It instructed the jury to disregard her testimony about Housh being in jail, and had her withdraw her testimony about his imprisonment. It strongly admonished the jury not to consider the potentially prejudicial evidence, and we must presume that the jury followed those instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) The court could reasonably conclude that its remedial measures were sufficient to eliminate any significant prejudice Housh could have suffered from the isolated remarks.

In this respect, Housh's case is no different from others where references to the defendant's criminality were held to have been harmless. (*People v. Collins* (2010) 49 Cal.4th 175, 197–199 (*Collins*) [affirming denial of a mistrial motion where defendant called witness collect every night "when he was still in Susanville before he got out in December"; the court "did not abuse its discretion in concluding that any prejudicial effect could be cured by an admonition"]; *People v. Avila, supra,* 38 Cal.4th at pp. 572–574 [witness testified that he was told "don't do nothin', because [the defendant] barely got out of prison . . . [and was] crazy"; no abuse of discretion in denying a mistrial motion because the court admonished the jury not to consider the testimony for any purpose]; see also, *People v. Valdez* (2004) 32 Cal.4th 73, 122-123 (*Valdez*) [rejecting claim of prosecutorial misconduct where witness testified that he obtained a picture of the defendant for a photo lineup when he "*went to the jail* and found a mug photo"; holding that "an admonition would have cured any prejudice"].)

Housh contends that *Collins* and *Valdez* are distinguishable because the victim here made two improper statements, whereas the witnesses in those cases made only one,

but that difference is immaterial. Housh argues that *Collins* is distinguishable because the prosecutor in this case was guilty of misconduct, whereas the prosecutor in *Collins* was not. (*Collins*, *supra*, 49 Cal.4th at p. 198 [no misconduct where the defense chose to pursue the line of questioning that led to the improper testimony].) But there was no prosecutorial misconduct here. Housh writes: "[T]he first motion for mistrial was prompted by the reference to appellant's custody status. The error was not inadvertent. The trial court had ordered the prosecutor to inform her witnesses not to discuss appellant's custody status, and the prosecutor admitted that she failed to inform [the victim] of the exclusionary order." However, while the prosecutor admitted she might not have told the victim to avoid referring to Housh's custodial status, she said she did advise her not to mention his prior convictions, so the omission as to custodial status appears to have been inadvertent. Moreover, the questions that produced the improper responses were not specifically aimed at eliciting them. (Compare, *Valdez*, *supra*, 32 Cal.4th at p. 123 [no misconduct where prosecutor "merely asked [the witness] how he managed to get defendant's photograph in the photographic lineup, not necessarily where he got the photograph"], with *People v. Friend* (2009) 47 Cal.4th 1, 33 [prosecutor committed misconduct by "directly posing a question [that] violated the trial court's prior evidentiary ruling"].)

D. <u>Evidence of Domestic Violence Against Kim Doe</u>

Housh contends that admission of Kim's testimony about his domestic violence against her violated his constitutional rights to due process and equal protection, and was an abuse of discretion under Evidence Code section 352. The court overruled his objection to her testimony, finding that it was admissible under Evidence Code sections 1108 and 1109, and under Evidence Code section 1101, subdivision (b) "as showing a common plan or scheme."[2]

---

[2] Since Housh was not convicted of the sexual assault charges, he does not contest admission of Kim's testimony under Evidence Code section 1108, which allows evidence of a propensity to commit such offenses, nor does he challenge introduction of C.'s testimony, which was admitted under Evidence Code section 1108.

When a defendant is accused of an offense involving domestic violence, Evidence Code section 1109 provides for admission of other acts of domestic violence by the defendant "if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1109, subd. (a)(1).) Evidence of acts occurring more than 10 years before the charged offense is inadmissible "unless the court determines that the admission of this evidence is in the interest of justice." (Evid. Code, § 1109, subd. (e).)

When Kim's possible testimony was first discussed, the court tentatively ruled that the evidence was admissible, stating: "The People's view relating to [Kim] that there is profound similarity in the present incident is shared with the Court in that we have what is sometimes described as the classic domestic relationship, this courtship followed by a progression of abuse resulting in physical abuse but, most profoundly, here, culminating ultimately in sexual abuse. [¶] The description is, perhaps, even chilling to see someone from 20 years ago describing conduct by the defendant that is being described in the present time by the victim in this present case. [T]he similarities carry with it some profound relevance and highly probative value in this case. [¶] . . . [¶] In my view, the relevance here is so profound that it outweighs the prejudice and under no circumstances can I conclude, or would I conclude, that the prejudicial value substantially outweighs the probative value."

The court later reaffirmed its tentative ruling, finding Kim's experiences with Housh "similar, in a chilling way nearly," to those of the victim, "and those similarities also counterbalance the age of the case, the age or the remoteness, and the continued alleged pattern here does establish the propensity and the character trait that is at issue here. [¶] So I think that the remoteness does not militate in favor of excluding the evidence."

We agree with the numerous cases that have rejected constitutional challenges such as those Housh raises to Evidence Code section 1109. (See, e.g., *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14; *People v. Price* (2004) 120 Cal.App.4th 224, 240; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309–1313.)

We also conclude there was no abuse of discretion under Evidence Code section 352.  Housh argues that "the prior acts were totally dissimilar to the charged crimes."  However, like the victim, Kim testified that Housh did not begin physically abusing her until some months into their relationship.  Like Kim, the victim testified that she eventually suffered such abuse consistently, over an extended period of time.  Housh contends that Kim's abuse was too remote to be of probative value, but the court considered the passage of time and reasonably found that the "similarities between the prior and current acts . . . balanced out the remoteness." (*People v. Waples* (2000) 79 Cal.App.4th 1389, 1395.)

The evidence of Housh's abuse of Kim was not unduly prejudicial.  Kim's testimony about the nature of her physical abuse was far less inflammatory than that of the victim.  Kim admitted telling prosecution investigator George that she could not remember much about the assaults, and that "[m]y brain has totally blocked it out."  She did not testify to any details of the abuse other than saying that he would punch her, "open hand," and push her up against a wall.  When she was asked, "What parts of his body would he use to hurt you?" she unresponsively answered, "Whatever part he could hit."  The victim, in contrast, was far more explicit.  She testified not only to being punched and shoved, but also to being slapped, kicked, pulled by the hair, thrown to the ground, karate-chopped in the neck, suffocated with a pillow, and jabbed under the toenails with a letter opener.  The court could reasonably conclude that the probative value of Kim's testimony about Housh's domestic violence would not be substantially outweighed by its prejudicial effect.

E. <u>The Montana Prior—Sufficiency of the Evidence</u>

Housh contends that the prosecution's evidence concerning his conviction in Montana was insufficient to sustain the court's finding that it qualified as a strike under California law.

(1) *Record*

The information resulting in the Montana conviction charged Housh, then going by the name Carlos Aguilar, with felony assault on August 3, 1996, "in that he purposely

or knowingly caused bodily injury to John Alfred Christenson, Jr., by cutting him with a knife, in violation of Section 45-5-202(2), MCA." The Montana statute provided at the time in relevant part: "(2) A person commits the offense of felony assault if he purposely or knowingly causes: [¶] (a) bodily injury to another with a weapon; [¶] (b) reasonable apprehension of serious bodily injury in another by use of a weapon . . . ." (Mont. Code Ann. § 45-5-202) The trial court judgment in the case states that a jury found Housh "guilty of the offense charged."

He was sentenced in the judgment to serve two years in prison for the assault, and an additional two years under an enhancement statute for use of a weapon in committing the offense. (Former Mont. Code Ann. § 46-18-221.) The enhancement statute applied to "[a]person who has been found guilty of any offense and who, while engaged in the commission of the offense, knowingly displayed, brandished or otherwise used a firearm, destructive device, as defined in 45-8-322(1), or other dangerous weapon." (*State v. Wilson* (Mont. 1997) 936 P.2d 316, 317.)

The circumstances of the offense are described in a Montana Supreme Court opinion. (*State v. Aguilar* (Mont. 1999) 983 P.2d 345.) Housh was visiting the home of his ex-wife Kim and playing with their sons. Christenson, Kim's boyfriend, was upstairs sleeping. The boys told Housh that Christenson had verbally and physically abused them, and Kim confirmed the physical abuse. Housh then "confronted Christenson. He asked Christensen to go out onto the porch to talk to him. After some conversation, [Housh] grabbed Christenson by the throat and held him against the house. Christenson told [Housh] that he was cutting him, and [Housh] responded that 'that was what he intended to do.' He then told Christenson that if he ever mistreated his sons again he would kill him. [¶] . . . At trial, Christenson testified that he had a scratch on the neck, and was cut on the thumb. He testified that although he did not see a knife, [Housh] had held one to his throat. [Housh] maintained that he scratched Christenson on the neck with his fingernails, not a knife."

The court reversed Housh's weapon enhancement under the double jeopardy clause of the Montana Constitution because it punished him twice for using a weapon.

26

(*State v. Aguilar, supra*, 983 P.2d at p. 347; see *State v. Guillaume* (Mont. 1999) 975 P.2d 312, 317 [the defendant "was subjected to double punishment for use of a weapon: once when the charge was elevated from misdemeanor assault to felony assault, and again when the weapon enhancement statute was applied"].)

(2) *Analysis*

California strike offenses include "any felony in which the defendant personally used a dangerous or deadly weapon." (§ 1192.7, subd. (c)(23).) Cutting someone's throat with a knife plainly qualifies. (See, e.g., *People v. Page* (2004) 123 Cal.App.4th 1466, 1468, 1472 [defendant guilty of felony assault with a deadly weapon under § 245, subd. (a)(1) where his accomplice threatened the victim while holding a sharp pencil up to the victim's neck].)

Housh notes that a defendant could have been convicted of felony assault under paragraph (b) of the Montana statute merely by causing "reasonable apprehension of serious bodily injury in another by use of a weapon," rather than "bodily injury to another with a weapon" as provided in paragraph (a), and he cites cases for the proposition that a conviction based upon an apprehension of serious injury under paragraph (b) did not necessarily require that a weapon actually be used. (*State v. Hagberg* (Mont. 1996) 920 P.2d 86, 89–90 [victim reasonably feared serious bodily harm from a weapon before seeing that the defendant was holding a gun]); *State v. Misner* (Mont. 1988) 763 P.2d 23, 25 [victim reasonably feared serious bodily harm even though he did not see the defendant waving his gun].)[3] "If the record does not disclose any of the facts of the offense actually committed, the court will presume the prior conviction was for the least offense punishable under the foreign law." (*People v. Mumm* (2002) 98 Cal.App.4th 812, 816.)

_____

[3] Housh also relied on *State v. Smith* (Mont. 2004) 95 P.3d 137 in his opening brief, but then in his reply brief criticizes the People for discussing the case, arguing that the case is "irrelevant" because it applied an expanded version of the Montana statute enacted after he was prosecuted.

The record here showed beyond a reasonable doubt that Housh was convicted under paragraph (a) of the statute, not (b). He was charged in the information with cutting the victim with a knife, not merely putting the victim in fear. He was, according to the judgment, convicted of the "offense charged." The Montana Supreme Court's opinion showed that cutting the victim's throat with a knife was in fact the conduct for which Housh was convicted. Housh admitted scratching the victim's throat but claimed to have done so with his fingernails, not a knife. The verdict showed that the jury rejected that claim. The record of the Montana conviction thus established that Housh was convicted of a prior offense that qualified as a strike under California law.

Housh argues that *People v. Woodell* (1998) 17 Cal.4th 448 (*Woodell*), precludes consideration of the facts set forth in the Montana opinion because they were disputed. *Woodell* held that "appellate opinions, in general, are admissible as part of the record of conviction that the trier of fact may consider in determining whether a conviction qualifies under the sentencing scheme at issue." (*Id.* at p. 457.) "If the appellate court did state the pertinent facts, a trier of fact is entitled to find that those statements accurately reflect the trial record." (*Ibid.*) *Woodell* cautioned, however, that some appellate opinions might have little probative value. The court "should carefully consider whether the opinion as a whole, including any factual statements, is probative on whether the conviction was based on a qualifying theory. It should not simply admit any opinion containing relevant factual statements but only those probative on this specific issue. For example, if the opinion refers to facts in a fashion indicating the evidence was disputed *and the factual issue unresolved*, that reference would have little, if any, tendency to show the basis of the conviction and would, alone, not justify admitting the opinion." (*Id.* at p. 460 (italics added).) The facts in the Montana Supreme Court's opinion were properly considered because they showed that Housh was prosecuted on a qualifying theory, cutting the victim with a knife, and that the factual dispute over the point, whether the injuries were inflicted with fingernails or a knife, was resolved against him.

Housh argues that the court could not consider the facts in the Montana opinion because they were inadmissible hearsay. However, the facts were admissible for the non-

28

hearsay purpose of determining the crime for which he was convicted. (*Woodell*, *supra*, 17 Cal.4th at p. 459.) "The *Woodell* court made clear that appellate opinions introduced as part of the record of conviction to prove a strike may be admitted into evidence even though they may contain factual statements that are not independently admissible under the hearsay rule. . . . Opinions containing hearsay are admissible because they are not admitted to prove the truth of the hearsay statements. The question before the fact finder when determining a strike allegation is not whether the defendant actually did the actions the opinion states he did, but instead is only whether the defendant's conviction was based on the facts needed to establish a strike." (*In re Richardson* (2011) 196 Cal.App.4th 647, 665–666.)

F. <u>Right to a Jury Trial on the Montana Prior</u>

Housh argues that the court erroneously denied his request to have the jury decide whether his Montana conviction constituted a strike. In so ruling, the court followed the holding of *People v. McGee* (2006) 38 Cal.4th 682, 686, 708–709 (*McGee*), that a defendant has no right to a jury trial of that issue under the reasoning of *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), or *Shepard v. United States* (2005) 544 U.S. 13 (*Shepard*).

Housh contends that *McGee* has been abrogated by the Supreme Court's decision in *Descamps v. United States* (2013) ___ U.S. ____, 133 S.Ct. 2276 (*Descamps*), a case interpreting the Armed Career Criminal Act (ACCA) (18 U.S.C. § 924(e)).

The ACCA "increases the sentences of certain federal defendants who have three prior convictions 'for a violent felony,' including 'burglary, arson, or extortion.' To determine whether a past conviction is for one of those crimes, courts use what has become known as the 'categorical approach': They compare the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime—i.e., the offense as commonly understood. The prior conviction qualifies as an ACCA predicate only if the statute's elements are the same as, or narrower than those of the generic offense." (*Descamps*, *supra*, 133 S.Ct. at p. 2281.)

A "modified categorical approach" is used "when a prior conviction is for violating a so-called 'divisible statute.' That kind of statute sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building or an automobile. If one alternative (say, a building) matches an element of the generic offense, but the other (say, an automobile) does not, the modified categorical approach permits sentencing courts to consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction." (*Descamps*, *supra*, 133 S.Ct. at p. 2281.)

*Descamps* noted that the modified categorical approach was properly applied in *Shepard*, *supra*, 544 U.S. 13, which involved a divisible Massachusetts burglary statute that covered entries into boats and cars, as well as the "generic burglary" of entry into a building. (*Descamps*, *supra*, 133 S.Ct. at p. 2284; *Shepard*, *supra*, at pp.15–16.) *Shepard* held that, to determine whether the defendant had committed a generic burglary, the court could examine the "terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the pleas was confirmed by the defendant, or . . . . some comparable judicial record of this information." (*Shepard* at p. 26) However, the court could not examine "police reports or complaint applications" (*id.* at p. 16) that went "beyond conclusive records made or used in adjudicating guilt" (*id.* at p. 21). Doing so could lead to "a disputed finding of fact about what the defendant and state judge must have understood as the factual basis of the prior plea" that implicated the defendant's jury trial right under *Apprendi*. (*Id.* at p. 25.) "The rule of reading statutes to avoid serious risks of unconstitutionality [citation], therefore counsel[ed the court] to limit the scope of judicial fact finding on the disputed generic character of a prior plea . . . ." (*Id.* at pp. 25–26.)

*Descamps* held that the modified categorical approach could not be used "when a defendant was convicted under an 'indivisible' statute—i.e., one not containing alternative elements—that criminalizes a broader swath of conduct than the relevant generic offense." (*Descamps*, *supra*, 133 S.Ct. at pp. 2281, 2283.) In part, such judicial fact finding would implicate the defendant's jury trial right. "[T]he court's finding of a

predicate offense . . . would (at the least) raise serious Sixth Amendment concerns if it went beyond merely identifying a prior conviction. Those concerns, we recognized in *Shepard*, counsel against allowing a sentencing court to 'make a disputed' determination 'about what the defendant and state judge must have understood as the factual basis of the prior plea,' or what the jury in a prior trial must have accepted as the theory of the crime." (*Descamps*, *supra*, at p. 2288.) The "elements, not facts," of the crime control whether it qualifies as an ACCA predicate. (*Id.* at p. 2283.)

 *Descamps* does not call into question the trial court's determination in Housh's case, or effectively overrule *McGee*. *Descamps* identifies no constitutional concerns with judicial examination of the record of a prior conviction under a divisible statute like the Montana assault law to determine whether the elements of the crime qualified it as a strike.

 We reject Housh's claim that *Descamps* abrogated *McGee* for the same reasons *McGee* concluded that *Shepard* did not disapprove its analysis: "Although the *Shepard* decision may suggest that a majority of the high court would view the legal issue presented in the case before us as presenting a serious constitutional issue, the high court's decision did not purport to resolve that issue. The issue before the high court in *Shepard* was resolved as a matter of statutory interpretation, and the court did not purport to decide whether a state is constitutionally precluded from permitting a court to conduct the kind of examination of the record of a prior criminal proceeding that occurred in the case before us in determining whether a conviction constitutes a qualifying prior conviction for purposes of enhancements under a state sentencing statute." (*McGee*, *supra*, 38 Cal.4th at p. 708.)

 The trial court did not engage in impermissible fact-finding to conclude that Housh's Montana conviction qualified as a strike under California law. The charging document alleged Housh cut his victim with a knife. The verdict found him guilty as charged. Permissible review of these documents as provided in *Shephard* leads to one conclusion. Housh assaulted his victim in the Montana case by cutting him with a knife and not on the alternate basis of causing an apprehension of serious bodily injury.

31

G.  Section 654 Issues

Housh argues that his sentences on various counts should have been stayed under section 654.

Section 654 bars multiple punishments for " 'a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction.' " (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1214.)  " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' "  (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253.)  " 'If [a] defendant harbored "multiple criminal objectives," which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, "even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." ' "  (*People v. Wynn, supra,* 184 Cal.App.4th at p. 1215.)

Moreover, " 'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. . . .'  [Citations.]  This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935; see, e.g., *People v. Clair* (2011) 197 Cal.App.4th 949, 957–962 [defendant properly sentenced for each email he sent depicting child pornography, even though some were sent as few as ten minutes apart].)

Section 654 rulings are reviewed for substantial evidence, and the court has " 'broad latitude in making [these] determination[s]." (*People v. Wynn, supra,* 184 Cal.App.4th at p. 1215.)  All of the section 654 determinations here were supported by substantial evidence.

Housh was sentenced to consecutive terms for his convictions on counts 3 and 4, which alleged, respectively, infliction of corporal injury on a cohabitant on June 27 and

32

June 28, 2011. The court found that the June 28 crime "was a separate act of violence . . . on a separate occasion with separate intent" from the June 27 crime. Housh argues that he could not be convicted or sentenced on both counts because they were part of one "continuous beating." But the consecutive sentences were proper because he had time to reflect overnight on whether to resume the assaults. (*People v. Gaio, supra,* 81 Cal.App.4th at p. 935.)

Housh argues that section 654 prohibited the consecutive sentences he received on counts 7 (criminal threat) and 8 (dissuading a witness), because " 'his terrorist threat can only be considered incidental to his primary objective of dissuading [the victim] from testifying.' " However, the evidence did not dictate that conclusion. The criminal threat was to disfigure the victim by cutting her eye out with scissors so no other man would find her attractive. The dissuading a witness charge was based on preventing her from leaving the house or calling the police. The court had ample evidence from which to find that Housh had multiple criminal objectives that justified the consecutive sentences. (*People v. Wynn, supra,* 184 Cal.App.4th at p. 1215.) As the court explained, the dissuading "occurred over the entire period of the weekend . . . wherein he . . . engaged in many acts of violence that were not encompassed in the crimes for which he was convicted, engaged in other threats that were not encompassed in that 422 threat. And there was such an abundance of conduct that constituted dissuading that is separate and distinct with separate and distinct intent, objective, and conduct and, accordingly [count 8] is appropriately imposed consecutively."

The court imposed a concurrent sentence on count 9 (false imprisonment), finding that this crime involved "the same conduct that constituted dissuading the witness." As Housh correctly notes, the court should have stayed the sentence on this count. (*People v. Deloza* (1998) 18 Cal.4th 585, 594 ["if a defendant commits two crimes, punishment for one of which is precluded by section 654, that section requires the sentence for one conviction to be imposed, and the other imposed and then stayed"].)

H.  New Trial Motion

Finally, Housh contends that the court erred when it denied his motion for a new trial based on newly-discovered evidence (§ 1181, subd. 8)—a receipt for purchase of a pool at Walmart on June 26, 2011.

As we have said, Housh's sisters testified that he was at Swearengin's home building a pool on June 27, 28, and 29, 2011, when he was accused of assaulting the victim.  Swearengin said that she bought the pool at Walmart with a debit card and cash, but that she could not find a receipt, and her bank could not find a debit card statement, for the purchase.

According to the declarations of defense counsel and defense investigator Lewis in support of the new trial motion, Swearengin kept receipts for her purchases in a large plastic container, and they had all looked unsuccessfully through the container for the Walmart receipt before trial.  Counsel declared that he had asked Swearengin for the account number of the debit card she used to buy the pool, but she could not provide it.  Lewis declared:  "After the conclusion of trial, Ms. Swearengin's elderly mother moved in with Ms. Swearengin.  Ms. Swearengin cleaned out the hallway closet to make room for her mother's possessions.  Ms. Swearengin found the pool receipt in the hallway closet.  The receipt was sitting on the closet shelf underneath the large plastic storage container.  The receipt was not stored inside the container as it should have been."

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors:  ' "1.  That the evidence, and not merely its materiality be newly discovered; 2.  That the evidence be not cumulative merely; 3.  That it be such as to render a different result probable on a retrial of the cause; 4.  That the party could not with reasonable diligence have discovered and produced it at trial; 5.  That these facts be shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)  "A new trial motion based on newly discovered evidence is looked upon with disfavor.  We will only disturb a trial court's denial of such a motion if there is a clear showing of a manifest and unmistakable abuse of discretion." (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1151.)

34

The trial court denied Housh's motion on the grounds that the receipt could have been obtained with reasonable diligence prior to the trial by "going to Walmart, issuing subpoenas," and that "there is no reasonable chance that the result would be any different had that evidence been available at trial . . . . It was a tangential piece of evidence that in the Court's view would not have overcome the overwhelming evidence as to those matters for which the defendant was convicted."

We hold that the trial court could reasonably find that the receipt would not have changed the outcome, and need not reach the issue of diligence on the part of the defense. Housh's alibi defense rested on his sisters' testimony that he was away from the victim's home on the dates of the charged crimes. His reason for leaving the house was, as the court observed, a tangential matter. Whether he was building a pool or engaging in some other activity was immaterial. The pool receipt was not such powerful corroboration that it likely would have altered the jury's view of the sisters' credibility. Thus, denial of the new trial motion was not an abuse of discretion.

## III. DISPOSITION

The judgment is modified to stay the sentence on Count 9. As so modified, the judgment is affirmed. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment reflecting the modification.

_____
Siggins, J.

We concur:


_____
McGuiness, P.J.


_____
Jenkins, J.